# In the United States District Court
## for the Southern District of Georgia
### Brunswick Division

FILED
U.S. DISTRICT COURT

2008 OCT 24 PM 12: 26

CLERK
S. DIST. OF GA.

| | | |
|---|---|---|
| PROVIDENT LIFE AND ACCIDENT INSURANCE COMPANY, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHARLTON B. FUTCH, M.D., | : | |
| | : | |
| Defendant. | | NO. CV207-063 |

## O R D E R

Plaintiff, Provident Life and Accident Insurance Company ("Provident"), filed this action against Dr. Charlton B. Futch, seeking a declaration from the Court that it has no further responsibility to pay Futch disability benefits under the parties' contract.

Presently before the Court are the parties' cross-motions for summary judgment. Because Futch has produced insufficient medical evidence supporting his assertion that his osteoarthritis was caused by any accidental bodily injuries, Provident's motion will be **GRANTED**, and Futch's motion will be **DENIED**.

## BACKGROUND

On a motion for summary judgment, the Court must view

the evidence in the light most favorable to the non-moving party. Because the Court concludes that Provident is entitled to judgment as a matter of law when the evidence is viewed in the light most favorable to Futch, the Court will describe the facts in the light most helpful to the insured.

Futch began practicing medicine in 1974 and had a private practice in Brunswick, Georgia, as a general, vascular, and thoracic surgeon. The surgeries Futch performed ranged from one to twelve hours in length, but lasted one to four hours usually. Futch operated standing up.

On May 1, 1979, Provident issued a disability insurance policy to Futch, which paid benefits of $3,500 per month in the event of total disability under the policy. The policy provided that disability from "sickness or disease" was payable until Futch's sixty-fifth birthday, which was on April 1, 2006. However, benefits are payable for life if Futch's disability resulted from "accidental bodily injuries."

In the fall of 1996, Futch began experiencing pain and difficulty walking. In February 1997, Futch consulted with Dr. Carlton Savory, an orthopedic surgeon at the Hughston Clinic in Columbus, Georgia. At that time, Futch informed

2

Savory that "he was unable to stand and do surgery." Dkt. No. 65, Savory Dep. 18. Based on Futch's x-rays, Savory concluded that Futch had severe osteoarthritis in his right hip.[1]  Id., Ex. 3. Around the time Futch was examined by Savory, Futch retired from the active practice of medicine due to his medical problems.

On March 19, 1997, Futch reported to Provident that he had become totally disabled from his occupation effective February 21, 1997. On March 24, 1997, Savory performed right hip replacement surgery on Futch. On May 23, 1997, Provident began paying disability benefits to Futch under the parties' contract.

In 1984, while snow skiing, Futch fell and knocked a bone spur or osteophyte[2] off his right hip. Defendant was hospitalized for two days after the fall. An x-ray of Futch's right hip taken at the time showed the bone spur,

---

[1] During Savory's deposition, he stated that Futch's condition is best characterized as osteoarthrosis, although he acknowledged that sometimes that term is used interchangeably with osteoarthritis. Savory explained that he uses the term osteoarthrosis to indicate that it is "a mechanical form of arthritis," in contrast with arthritis, which suggests an inflammation of a joint -- "something that's more of a disease."  Id. at 55-56. Although the Court will refer to Futch's condition as "osteoarthritis" for ease of reference, that label, in and of itself, does not have any legal significance to the Court's analysis. Rather, the Court looks to the medical testimony regarding causation to determine whether there is a triable issue of fact.

[2] An osteophyte is a "bony excrescense or outgrowth, usually branched in shape." Taber's Cyclopedic Medical Dictionary 1546 (20th ed. 2005).

AO 72A
(Rev. 8/82)

which Futch admitted was not caused by the skiing accident. Futch took pain medication and limited his activity for a brief period while he convalesced, and then returned to his normal level of activity. Dkt. No. 67, Futch Dep. 73-74 & 162-64.

During Futch's deposition, he also stated that he experienced the bends, or caisson disease, while scuba diving in Martinique in 1980 or 1981. Id. at 188-89. The x-rays taken by Savory showed no evidence of osteonecrosis or avascular necrosis, which are characteristic signs of the joint damage cause by the bends.[3] Savory stated that it was unlikely that Futch's disability resulted from the bends. Dkt. No. 65, Savory Dep. 87-88.[4]

On October 20, 1997, Savory wrote a letter, which was later sent to Provident, stating that Futch's "arthrosis and

---

[3] One of Provident's experts, Dr. Omar Crothers, testified that avascular necrosis occurs when the failure of blood to recirculate from the hip causes a section of the bone to die. Dkt. No. 74, Crothers Dep. 30. Thereafter, the loss of bone can lead to osteoarthritis. Id.

[4] According to Defendant, years after the scuba diving incident, one of his physicians, Dr. Don Roberts (who is now deceased), concluded that Futch had suffered an episode of the bends, or barotrauma. Dkt. No. 67, Futch Dep. 188. Provident asserts that Futch's testimony concerning what Roberts told him is inadmissible hearsay that cannot be considered on summary judgment. Macuba v. Deboer, 193 F.3d 1316, 1322-24 (11th Cir. 1999). Futch has not made any argument that Roberts' statements to him are anything other than rank hearsay – out of court statements offered for the truth of the matter asserted – and the Court declines to consider such evidence in ruling on the parties' cross-motions.

AO 72A
(Rev. 8/82)

the secondary symptoms preclude him from standing for prolonged periods of time, particularly at the operating table. He is a general and vascular surgeon and his cases require prolonged standing. He is totally and permanently disabled and he will not be able to return [to] such activities." Dkt. No. 65, Savory Dep., Ex. 11. Futch's only physical limitation is "difficulty in standing" for prolonged periods of time. Id. at 22.

In August 2004, Futch's attorney wrote to Provident and stated that Futch was entitled to benefits for life because his disability was caused by accidental bodily injuries.[5] Previously, Provident had paid Futch pursuant to the "sickness or disease" provisions of the plan.

At Provident's request, Dr. Joel W. Saks, an Unum medical consultant, reviewed Futch's medical records to determine the cause of Futch's hip problems. Saks stated that the bone spur found in the 1984 x-ray had taken years to develop and was evidence of early osteoarthritis. Saks found no evidence of a permanent hip injury resulting from the skiing accident. Because more recent x-rays showed

---

[5] The parties note that Futch had his left hip replaced in 2004. Because the parties agree that Futch was disabled from his chosen occupation as a surgeon in 1997, the events surrounding Futch's left hip replacement seven years later have no bearing in this case.

5

osteoarthritis in both hips, Saks concluded "that whatever factors were associated with development of arthritis of the right hip likely also were operative on the left." Dkt. No. 66, Ex. 5, Saks Report (Oct. 25, 2004) at 6. Saks found that Futch's hip problems were the result of "gradually developing degenerative osteoarthritic changes," given that Futch had characterized his condition as a sickness repeatedly,[6] and that there was "[n]o single specific trauma or history of multiple trauma" in his claim file. Id.

On November 11, 2004, Provident advised Futch by letter that his claim had been administered under the "sickness or disease" provisions of the policy appropriately, and that his benefits were due to expire after his sixty-fifth birthday, on July 1, 2006. Futch appealed this determination, and Provident has continued to pay benefits to Futch subject to a reservation of rights.

During the administrative appeal process, Futch stated that he believed his condition was caused, at least in part,

---

[6] The Court notes that, in interpreting the provisions of the insurance contract, its analysis is not controlled by Futch's previous description of his condition as a sickness. Futch insists that he did not understand the policy language when he referred to his condition as a sickness. Where the policy definitions differ from medical definitions used by doctors, the Court's analysis is governed by the policy language. Combined Ins. Co. of Am. v. Rea, 195 Ga. App. 701, 702 (1990).

AO 72A
(Rev. 8/82)

by the "occupational trauma" of standing for prolonged periods while performing surgery. Consequently, Provident asked Saks to "comment on the development of Osteoarthritis in the absence of specific trauma or extraordinary stressors." Dkt. No. 66, Ex. 1, Doyle Aff. ¶ 17. Saks responded that

> In a large percentage of people with hip osteoarthritis, the condition is termed primary or idiopathic, indicating that its cause is not known. . . .[7] [G]enetic or environmental factors may play a large role in the incidence of the disease. . . . Having developed deterioration of the hip joint, it would be expected that any activity involving increased pressure on the hip joint, such as standing or walking, can be associated with increased discomfort. Periods of discomfort associated with moderate activity in persons with osteoarthritis of the hip indicates the presence of an inflamed hip joint. These symptoms do not imply exacerbation of the condition. . . . Moderate activity would not be expected to produce or exacerbate this condition.

Dkt. No. 66, Ex. 8, Saks Report (Apr. 26, 2005) at 3. Because Saks concluded that Futch had no history of traumatic injury, "[t]he presence of arthritic changes in both hips is suggestive of a preexisting bilateral condition of those joints." Id.; Dkt. No. 75, Saks Dep. 103-04.

On July 29, 2005, Saks asked Savory for more information

---

[7] In contrast, a medical condition is termed "secondary" when it has an identifiable cause. Dkt. No. 74, Crothers Dep. 23-24.

7

about Futch's condition. Savory responded that Futch had "underlying [osteoarthritis]" with "symptoms exacerbated by fall." Dkt. No. 65, Savory Dep., Ex. 15. Savory noted that his records did not indicate a specific injury to either hip, and that the "fall moved the timing probably" of Futch's surgery. Id. In response to Saks' inquiry regarding whether Savory thought Futch's right and left hip conditions were due to an injury or injuries, Savory wrote "[e]xacerbated as noted." Id.

Saks did not change his opinion based on Savory's correspondence, and stated that he did not believe that Futch's fall while skiing in 1984 resulted "in any change in the course of Dr. Futch's osteoarthritis of the hips." Dkt. No. 66, Ex. 9, Saks Report (Oct. 17, 2005) at 4. Saks assumed that Savory's reference to a "fall" referred to the skiing accident because Saks did not know of any other fall.[8] Dkt. No. 75, Saks Dep. 106.

Saks stated that "[a]ny factors associated with increased wear and tear or stresses about the hip joint surfaces can be associated with an increased incidence of

---

[8] There is evidence of record that Futch fell twice on a golf course in 2004, which exacerbated the symptoms of his osteoarthritis in his left hip, and that Futch had that hip replaced not long thereafter. As explained above, those injuries are not relevant to the question posed in the instant case.

8

osteoarthritis." Dkt. No. 66, Ex. 5, Saks Report (Oct. 25, 2004) at 6. During Saks' deposition, he explained that he did not consider standing for eight or twelve hours at a time doing surgery as a stressor that would cause Futch's osteoarthritis. Dkt. No. 75, Saks. Dep. 98-99.

On January 20, 2006, Provident requested an independent review of Dr. Futch's records by Dr. Omar Crothers, a board certified orthopedic surgeon. Like Saks, Crothers concluded that "it is most likely [that Futch] has primary osteoarthritis of the hips and that condition was not caused by an injury." Dkt. No. 74, Crothers Dep., Ex. 2 at 5. "Given that there is no mention of underlying cause in the pelvis (hip) x-ray readings done by an established hip Arthropasty surgeon (Dr. Savory) or in his office notes I believe that the claimant most likely has primary osteoarthritis." Id., Ex. 2 at 4.

Crothers concluded that Futch had not suffered the bends because his x-ray reports did not describe any osteonecrosis or avascular necrosis. "If he had developed avascular necrosis as his precursor to osteoarthritis, someone with Dr. Savory's expertise reading those x-rays[,] that would have been like falling off a log to make that determination." Dkt. No. 74, Crothers Dep. 28.

9

AO 72A
(Rev. 8/82)

On January 25, 2006, Futch's lawyer supplemented Provident's records, submitting Dr. Savory's letter dated September 17, 2003, to Futch stating that:

> The patient's diagnosis requiring surgery was osteoarthritis without a specific posttraumatic event such as a fracture. However, the patient's recurrent lower extremity injuries, as well as occupational trauma and standing for extended periods, i.e., greater than eight hours, would certainly have a significant role in the progression of his arthritic symptoms. It has been well established that osteoarthritis is a common occurrence for the major weightbearing joints after age 65; however, Doctor Futch's condition was one that required this significant intervention in 1997 at the age of 55. This is a marked difference in what is normally seen in the American patient population. That being said, it is noted that Doctor Futch had an early exacerbation [of] osteoarthritis secondary to the activities stated above.

Dkt. No. 65, Savory Dep., Ex. 13.

On May 11, 2006, Provident informed Futch that "based on the medical records received to date, we do not concur that the etiology of Dr. Futch's osteoarthritis is due to repetitive motion. We found that the etiology of Dr. Futch's osteoarthritis to be due to a disease process." Dkt. No. 66, Ex. 1, Doyle Aff. ¶ 22 & Ex. 15.[9]

---

[9] According to Plaintiff, Defendant has designated two experts in the case sub judice, Dr. Savory and himself. The Court notes that Futch has not cited to any expert testimony he has provided in support of his case.

10

On May 17, 2007, Provident filed this action seeking a declaratory judgment to resolve the dispute regarding whether Futch's disability resulted from sickness or disease, as Provident urges, or from accidental bodily injuries, as Futch insists.

## BURDEN OF PROOF

Futch contends that the burden of proof rests with the insurer because it filed this declaratory judgment action. Provident rejoins that Futch bears the burden of proof because he is the party who would bear the burden if the proceedings had not been brought as a declaratory judgment action. As a general principle, under Georgia law, the insured has the burden to prove that he suffered a loss covered by the policy. Reserve Life Ins. Co. v. Davis, 224 Ga. 665, 667 (1968); Donaldson v. Pilot Life Ins. Co., 177 Ga. App. 748, 749 (1986); Liberty Nat'l Life Ins. Co. v. Mitchell, 73 Ga. App. 673, 674-75 (1946).

That this case was brought as a declaratory judgment action does not alter the burden of proof. Rather, the evidentiary burden applies as it would in ordinary proceedings involving the legal matters in dispute. 22A Am.

11

Jur. 2d Declaratory Judgments § 241 (2008); Burden of Proof in Actions under General Declaratory Judgment Acts, 23 A.L.R.2d 1243, 1250-52 (1952)(citing cases).

As a general rule, in cases brought seeking a declaration of non-liability, the burden of proof is on the defendant "actor," that is, the party whose rights are at issue. Travelers Ins. Co. v. Greenough, 190 A. 129, 131 (N.H. 1937); Fireman's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1175-76 (3d. Cir. 1976); Preferred Accident Ins. Co. v. Grasso, 186 F.2d 987, 990-91 (2d Cir. 1951); Universal Underwriters Ins. Co. v. Stokes Chevrolet, Inc., 990 F.2d 598, 599 & 602 (11th Cir. 1993)(applying Alabama law); but see N.Y. Life Ins. Co. v. Stoner, 109 F.2d 874, 875-76 (8th Cir. 1940), rev'd other grounds, 311 U.S. 464, 467-68 (1940). Futch bears the burden of proof in this case.

**SUMMARY JUDGMENT STANDARD**

Federal Rule of Civil Procedure 56(c) provides for summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment

AO 72A
(Rev. 8/82)

as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. Celotex Corp., 477 U.S. at 323. If the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways--by either (1) negating an essential element of the non-movant's case or (2) by showing that there is no evidence to prove a fact necessary to the non-movant's case. See Clark, 929 F.2d at 606-08 (discussing Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) & Celotex Corp.).

If the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." Clark, 929 F.2d at 608. If the non-movant bears the burden of proof at trial, the non-movant must tailor his response to the method by which the movant carries its initial burden. If the movant presents evidence affirmatively disproving a material fact, the non-movant "must respond with evidence sufficient to withstand a

13

directed verdict motion at trial on the material fact sought to be negated." Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1116 (11th Cir. 1993).

If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." Id. at 1116-17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory averments contained in the complaint. Morris v. Ross, 663 F.2d 1032, 1033-34 (11th Cir. 1981).

Because Futch would bear the burden of proof at trial, Provident need only show an absence of evidence in support of Futch's claim to prevail on its motion.

**DISCUSSION**

Much like the bomber planes the undersigned witnessed during the Second World War "limping through the air," Dr. Charlton Futch came into federal court "on a wing and a

14

prayer."[10] Without any support in law or fact, Futch posits that standing up for long periods of time qualifies as "occupational trauma," and that this trauma caused his disability.

The "sickness" provision in the parties' contract provides that a sickness is "sickness or disease which is first manifested while this policy is in force." Dkt. No. 1, Ex. 1 at 1. The policy provides that "injuries" mean "accidental bodily injuries occurring while this policy is in force." Id.

According to Futch, a line of decisions involving an insured doctor and Provident support his case. Hallum v. Provident Life & Accident Ins. Co., 257 F. Supp. 2d 1373 (N.D. Ga. 2001); Hallum, 289 F.3d 1350 (11th Cir. 2002); Hallum, 276 Ga. 147 (2003); Hallum, 326 F.3d 1374 (11th Cir. 2003). Provident argues that the Hallum decisions are distinguishable, and the Court agrees.

After twenty-five years of practice as a obstetrician/gynecologist, Hallum noticed intermittent pain in his left hand when he performed certain medical procedures. Hallum was diagnosed with carpal tunnel

---

[10] Harold Adamson, "Comin' In on a Wing and a Prayer" (1942).

15

syndrome. 289 F.3d at 1352. One of Hallum's treating physicians testified that Hallum's condition was due to a repetitive motion disorder caused by his occupation. Another physician testified that, in light of Hallum's occupational history, he believed the carpal tunnel syndrome was due to "significant hand activity, such as surgery, over an extended period of time." Id. at 1353.

Except as noted herein, Hallum had a disability benefits policy with Provident that was identical in all material respects to Futch's policy. The Hallum district court found that summary judgment was appropriate in the doctor's favor, given that there was no evidence contradicting the insured's expert testimony that Hallum's repeated hand motions caused his disability. 257 F. Supp. 2d at 1381. On appeal, the Eleventh Circuit certified a question of law with respect to the case to the Georgia Supreme Court, to determine whether the plaintiff's condition should be characterized as an injury or a sickness under Georgia law. 289 F.3d at 1354.

In response, the state supreme court reinforced the district court's conclusion, stating that, "[u]nder Georgia law, a person who unexpectedly suffers from carpal tunnel syndrome brought on by years of intentional repetitive hand motions that renders him disabled has suffered an 'injury'

16

as that term is defined in this Provident . . . insurance policy." 276 Ga. at 149.

Because the policy used the word "accidental" to describe the injury itself, rather than the means that caused the injury, the Georgia Supreme Court determined that an injury "means a bodily injury that was unexpected, but could have arisen from a conscious or voluntary act. . . . Accordingly, an unexpected physical injury that disables the insured is covered as an 'injury' under this policy." 276 Ga. at 148.[11] Thereafter, the Eleventh Circuit affirmed the district court's decision. 326 F.3d at 1376.

Turning to the instant dispute, Futch argues that the salient issue is not whether his arthritic condition was the result of an injury or injuries. According to Defendant, his disability is not osteoarthritis, it is hip pain that is so severe that it prevents him from standing or walking for prolonged periods of time. Plaintiff responds that Defendant's characterization of his disability is contrary to law. According to Provident, pain itself is not a bodily

---

[11] The supreme court also noted that, under the policy at issue, a disability could be "caused by more than one injury or sickness, or could result from both. If a disability is a result of both, the insurer is liable for the longer of the two disability periods." Id. Yet, as Provident notes, and Futch does not dispute, Futch's insurance policy does not contain such a clause.

AO 72A
(Rev. 8/82)

injury, it is a physical manifestation of a bodily injury, like carpal tunnel syndrome, or in some cases, osteoarthritis. In support of Provident's argument, the insurer cites the Hallum decisions, where the courts stated that the insured's disability was carpal tunnel syndrome, not pain resulting therefrom. 257 F. Supp. 2d at 1377; 289 F.3d at 1354; 276 Ga. at 149; 326 F.3d at 1376.[12]

Contrary to Defendant's assertions, the coverage question does turn on whether Futch's disabling condition, osteoarthritis, was caused by injury or sickness. It is beyond dispute that Futch worked until his occupational duties became too much to bear and caused him to stop working as a surgeon. Futch submits that the cumulative effect of his repeated "occupational traumas," i.e., standing for prolonged periods of time while performing surgery, caused his disability.

Futch contends that Savory did not determine conclusively Futch had no signs of osteonecrosis or avascular necrosis. Instead, Savory reported that the "radiographic

---

[12] See Scharlow v. Schweiker, 655 F.2d 645, 648 (5th Cir. 1981)(in social security disability cases, pain can be a disabling condition if an underlying impairment is shown); Hyatt v. Sullivan, 899 F.2d 329, 336-37 (4th Cir. 1990)(same). In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

18

appearance did not appear to be osteonecrosis, but in advanced disease, sometimes it's difficult to make that differentiation." Dkt. No. 65, Savory Dep. 87. Provident responds that one might reasonably infer from this testimony that Savory could not determine if Futch's right hip showed evidence of caisson disease because, in February 1997, that hip showed "severe osteoarthritis." But at that time, Futch's left hip showed "early osteoarthrosis" only. Dkt No. 66, Ex. 19, Meares Aff., Ex. at 7. If Futch had suffered osteonecrosis, Provident argues, his left hip should have showed signs of it at that time, but Savory did not note any signs of caisson disease in that hip. Dkt. No. 74, Crothers Dep. 31.

The burden is on Futch to produce evidence that his disability was caused by one or more injuries to recover under the policy. Even if Futch did experience the bends in the early 1980s, which Provident disputes, there is no evidence the bends caused Futch's osteoarthritis. Dkt. No. 65, Savory Dep. 31 & 87. Additionally, there is no evidence the skiing accident caused Futch's osteoarthritis. Saks stated that the bone spur described in the 1984 x-ray report had taken years to develop and was evidence of early osteoarthritis; it was not a cause thereof. Dkt. No. 75,

19

Saks Dep. 91-92. Futch agreed that the bone spur was not caused by his skiing accident. Dkt. No. 67, Futch Dep. 164.

According to Dr. Savory, Futch's "recurrent lower extremity injuries, as well as occupational trauma and standing for extended periods . . . would certainly have a significant role in the progression of his arthritic symptoms . . . Futch had an early exacerbation [of] osteoarthritis secondary to the activities stated above." Dkt. No. 65, Savory Dep. Ex. 13. Savory stated that the cause of Futch's condition was "underlying [osteoarthritis] — symptoms exacerbated by fall." Id., Ex. 15. Savory also noted that Futch's "occupational trauma" of standing for prolonged periods of time exacerbated his symptoms. Id. at 64-65.

Yet, Savory could not determine whether bodily injuries caused Futch's osteoarthritis:

> [H]is original underlying arthritis may have been exacerbated by the injuries, it may actually be the cause, or it may be the reason he had a hip replacement, and that's about all I can say about that. . . . I think his injuries in the past contributed to his current state, which is a bilateral hip replacement patient. . . . They [exacerbated his symptoms], and they may have exacerbated or accelerated the process.

Dkt. No. 65, Savory Dep. 74-75. Savory agreed that he could not express a definite opinion regarding whether Futch's injuries caused his condition, and stated that he thought

20

that no one could determine conclusively whether Futch's injuries caused his osteoarthritis.  Id.

As Provident notes, there is no probative evidence that Futch's osteoarthritis resulted from a series of injuries over an extended period of time.  Futch maintains that standing for long periods of time while performing surgery amounted to a series of accidental bodily injuries. Provident argues Futch is incorrect, and the Court agrees, at least on the evidence submitted here.

According to that evidence, the fact that Futch experienced pain while standing is a symptom of Futch's early onset of osteoarthritis, not a cause of the osteoarthritis. Dkt. No. 65, Savory Dep. 61 & 65; Dkt. No. 75, Saks Dep. 98–101.  That Futch's symptoms were aggravated by standing is immaterial here, where the issue is whether Futch's disability resulted from accidental bodily injuries.  Where the nonmoving party has the burden of proof, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . .  If the evidence is merely colorable . . . , or is not significantly probative . . . , summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249–50 (1986).

21

In contrast to the equivocal testimony provided by Savory, Provident's experts have stated that Futch's condition was not caused by any injury. Crothers testified that Futch likely suffered from primary osteoarthritis. Dkt. No. 74, Crothers Dep., Ex. 2 at 5. Saks' expert reports found the same. Dkt. No. 66, Ex. 8, Saks Report (Apr. 26, 2005) at 3. The expert opinions offered by Crothers and Saks are the only probative medical opinions offered regarding the etiology of Futch's disabling condition.

Indeed, Futch conceded that Savory "could offer no firm conclusion regarding what originally caused defendant's osteoarthritis." Dkt. No. 94-2 ¶ 132. As Provident notes, this admission shows that there is no probative evidence supporting Futch's assertion that his condition was caused by a series of traumas or a single traumatic event. In contrast to <u>Hallum</u>, there is no probative evidence that Futch's osteoarthritis was caused by repetitive motion injuries, or any form of "occupational trauma." Thus, summary judgment is appropriate in the insurer's favor.

**CONCLUSION**

For the reasons described above, Defendant's motion for

22

summary judgment is **DENIED,** and Plaintiff's motion for summary judgment is **GRANTED.** Dkt. Nos. 59 & 60.[13] The Clerk is **DIRECTED** to enter judgment accordingly.

    **SO ORDERED,** this  24th  day of October, 2008.

                    *Anthony A. Alaimo*

                    JUDGE, UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF GEORGIA

---

[13] The Court has read and considered Defendant's objection to Magistrate Judge James E. Graham's decision denying his motion to strike Plaintiff's complaint or for alternative sanctions and relief, for alleged discovery abuses, and the same is hereby **OVERRULED.** Dkt. No. 124.

AO 72A
(Rev. 8/82)